IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2019

## STATE OF TENNESSEE v. EDWARD DEAN

**Appeal from the Criminal Court for Shelby County**
No. 15-04695          Paula L. Skahan, Judge

_____

### No. W2018-01363-CCA-R3-CD

_____

The Defendant, Edward Dean, was convicted by a Shelby County Criminal Court jury of attempted second degree murder, a Class B felony; employing a firearm during the commission of a dangerous felony, a Class C felony, and unlawful possession of a firearm by a convicted felon, a Class C felony. He was sentenced by the trial court as a Range I offender to twelve years at 30% for the attempted second degree murder conviction, ten years at 100% for the employment of a firearm conviction, and six years at 30% for the unlawful possession of a firearm conviction. The trial court ordered that the sentences be served consecutively, for an effective sentence of twenty-eight years in the Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence in support of his attempted second degree murder and unlawful possession of a firearm convictions and argues that the trial court erred in denying his motion to suppress his statement to police, in limiting the testimony of a defense witness physician, in failing to give the jury an instruction on diminished capacity, and in failing to give sufficient weight to mitigating factors in sentencing. Following our review, we affirm the judgments in Counts 1 and 2 but reverse the judgement in Count 3.

**Tenn. R. App. P 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Barry W. Kuhn (on appeal), and Nick Cloud and Tom Williams (at trial), Memphis, Tennessee, for the appellant, Edward Dean.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Omar Malik and Matt Haywood, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

This case arises out of the Defendant's March 26, 2015 early morning shooting of his then-girlfriend, Charlean McKenzie, in the bedroom of her Memphis home. The victim sustained a gunshot wound to her face that shattered her jaw, three gunshot wounds to her chest, and one gunshot wound to her liver. Immediately after the shooting, the Defendant left and went to a service station, where he called 911 and waited for the police to arrive. When officers responded, the Defendant flagged them down and informed them that he had shot "that b****." That same morning, the Defendant gave a formal written statement to detectives admitting that he had shot the victim following an argument but denying that he ever intended to kill her. The Defendant was subsequently indicted for the attempted first degree murder of the victim, convicted felon in possession of a firearm, and employing a firearm during the commission of a dangerous felony.

## Suppression Hearing

Prior to trial, the Defendant filed a motion to suppress, arguing that his statements to the police were involuntary because he was not Mirandized by the arresting officer and was intoxicated when he spoke to the detectives. At the November 18, 2016 suppression hearing, the arresting officer, Officer Daemien Jefferson of the Memphis Police Department, testified that he was at the victim's Memphis home responding to the shooting when dispatch informed him that a man had called from a pay phone at a service station at the corner of Mendenhall and Knight Arnold who wanted to turn himself in for assaulting his girlfriend. He said that he and Officer Tabor, who was in a separate vehicle, responded to the intersection, where they were flagged down by a man who was later identified as the Defendant. He and Officer Tabor exited their vehicles, approached the Defendant, and instructed the Defendant to show them his hands.

Officer Jefferson testified that as he was patting the Defendant down, the Defendant protested, saying, "I called y'all. Why you patting me down?" and "I called y'all after I shot the b****." Officer Jefferson could not recall if the Defendant smelled of alcohol, if his speech was slurred, or if he appeared to be under the influence of an intoxicant but agreed that if such had been the case, he would have informed the "reporting officers." On cross-examination, he testified that all he recalled asking the Defendant was that he show them his hands. To his recollection, Officer Tabor never asked the Defendant anything either. On redirect examination, Officer Jefferson reiterated that he did not ask the Defendant any questions.

Sergeant Kelvin Hailey of the Memphis Police Department, the case officer in charge of the investigation, testified that by the time he arrived at the victim's home, he had learned that the victim had been transported to the hospital in critical condition and that the Defendant had been taken into custody after calling and turning himself in. He said he assigned tasks to other officers, visited the service station to check if there was any video and to talk to the Defendant's nephew, and then went to 201 Poplar, where the Defendant had been taken after his arrest. At approximately 4:35 a.m., he and Sergeant Robert Thompson began interviewing the Defendant by asking him general questions about his background and education. During that initial general conversation, the Defendant informed them that he wanted to tell them what had happened because he did not "believe in running."

Before taking the statement, they read the Defendant his rights, explained those rights to him, and had the Defendant read the advice of rights form aloud. The Defendant initialed in the space provided indicating that he understood his rights and signed at the end of the form indicating that he wished to give a statement. The Defendant was cordial, direct, mature and concise throughout. He did not appear to be sleepy, tired, or under the influence of any intoxicant. The Defendant informed them that he had consumed some alcohol, but when Sergeant Hailey asked him if he was clear-headed, he replied that he was. The Defendant also informed Sergeant Hailey, when directly asked, that he understood the seriousness of the situation and their conversation. He did not smell of alcohol, his speech was not slurred, and he was very responsive to questions and appeared to have no difficulty in recalling the events that he related.

Sergeant Hailey testified that the Defendant began his formal written statement at 4:56 a.m., relating that he and his girlfriend had been arguing, that he went into their shared bedroom, that she followed him to continue the argument, and that he "upped" a pistol and shot her before fleeing from the home. The Defendant's statement was consistent with the information Sergeant Hailey had previously gathered about the crime and nothing in the Defendant's statement was "off the wall" or unusual. He identified the Defendant's signed and initialed waiver of rights and his signed statement, which were admitted as exhibits to the hearing.

On cross-examination, Sergeant Hailey testified that the Defendant did not volunteer how much alcohol he had consumed. He could not recall if he asked the Defendant during their initial conversation or during the Defendant's preliminary statement about how much alcohol he had drunk. He acknowledged that he did not ask the Defendant about his alcohol consumption during the formal, question-and-answer format of the written statement. On redirect examination, he testified that he had extensive experience with individuals who were under the influence and that it was the

police department's policy not to take a statement from an individual who was intoxicated, "high," or under the influence of prescription medication.

The Defendant testified that he drank two pints of 80-proof "Burnett['s] Vodka" and four 24-ounce containers of beer in the hours before his statement. According to the Defendant, he began drinking at 6:00 or 7:00 p.m. on March 25, had his last drink approximately thirty minutes before he called 911 on the morning of March 26, and still felt intoxicated at the time he gave this statement. He said he told Sergeant Hailey that he had been drinking but did not recall telling him how much he had to drink. He stated that after he finished his statement, he was taken first to the Shelby County Jail and then to "detox." On cross-examination, he acknowledged that he never told Sergeant Hailey that he was too drunk to answer questions or to understand what was happening. He further acknowledged that he provided a detailed account of what had transpired. He insisted, however, that those details did not mean that he was not intoxicated and on redirect examination testified that he was not sober when he gave his statement.

On February 10, 2017, the trial court entered a detailed written order denying the motion to suppress. Among other things, the court found that Officer Jefferson was not required to issue Miranda warnings to the Defendant at the time of his arrest because he did not solicit any information from him, and thus, the Defendant's voluntary statement to him was admissible at trial. Accrediting Sergeant Hailey's testimony about the Defendant's appearance and manner during questioning, the court further found that "the Defendant's waiver was voluntarily made in that he received and understood the Miranda warnings, after given the chance to invoke those rights, desired not to, and consequently gave an uncoerced statement to the officers."

## Trial

### State's Proof

Charlean McKenzie, the victim, testified that she met the Defendant in 2014 and dated him for approximately five or six months. At the time of the shooting, she was living in a southeast Memphis home with her mother, her daughter, her two grandchildren, and her "baby boy." The Defendant had a separate residence, but each of them regularly spent nights at the other's home. The Defendant came to her home at about 10:00 or 11:00 a.m. on March 25, 2015 but then left. She and everyone else in her household were in bed by 10:00 p.m. that night following a family gathering that they had held earlier in the day. At 10:30 or 11:00 p.m., she heard a knock at the door, got up, and opened the door to find the intoxicated Defendant, who was accompanied by his nephew. The Defendant was incoherent and obviously upset about something, but he was talking more to his nephew than to her. She and the Defendant never argued.

- 4 -

The victim testified that the Defendant's nephew left and she went to her bedroom, followed immediately by the Defendant. She said she lay down on her bed facing the wall, and the Defendant sat on the edge of the bed beside her. She then heard the Defendant say, "[B]****, I'm going to kill you." The light was off, and she was at first unsure whether he was talking to her or to someone on the phone, so she got up and turned on the overhead light. As she did so, the Defendant reached into the pocket of his jacket that was hanging in the closet, pulled out a gun, and "opened fire" at her.

The victim testified that the Defendant fired five times directly at her, with the first shot striking her in the mouth, three shots striking her in the chest, and one shot striking her in the liver. She remembered each and every shot:

> I remember the first shot, I remember the second shot, I remember the third shot, I remember the fourth shot, and I also remember the fifth shot. After the fifth shot, that's when I was, that's when I was -- my door was shut[,] and I was able to open the door and come out of the room being shot.

The victim testified that she tried to wake her brother and her son but was unable to rouse them so she went into the bedroom that her daughter shared with her mother. Her daughter woke, asked her what was wrong, and turned on her bedside light. The victim said she was unable to talk so she just pointed before collapsing at the foot of her mother's bed. She did not, however, lose consciousness until after the ambulance had delivered her to the hospital. When she awoke in the hospital, she learned that her jaw and bottom gum had been shattered and that she had two tubes draining out of her liver.

The victim testified that she spent approximately one month in the hospital immediately after the shooting and had, to date, undergone three reconstructive surgeries on her mouth. She also underwent surgery five or six months after the shooting to remove a bullet that surgeons had initially left in her body but which had later migrated to her breast. According to the victim, the shooting left her with 100% nerve damage to her mouth and an inability to walk normally. She was certain that she and the Defendant had not been arguing at the time of the shooting. She testified that the Defendant said nothing to her before the shooting other than his statement that he was going to kill her. She said his speech was only slightly slurred and that she could clearly understand what he said.

On cross-examination, the victim denied that her surgeries or the various pain medications she was taking affected her memory of the events. After having her memory refreshed by the statement she gave to the police after her release from the hospital, she acknowledged that she told the Defendant's nephew that she did not want the drunk

- 5 -

Defendant in her home and that he should take him away.  She denied that she argued with the Defendant after his nephew left her home.  When asked if the shooting could have occurred closer to her daughter's 12:59 a.m. 911 call than the 10:30 or 11:00 p.m. time she mentioned in her direct testimony, the victim said that she did not know exactly when it happened because she was in shock.  She was certain, however, that her memory of the event itself was accurate.  The victim denied that the Defendant told her that night that he had wrecked his car, testifying that the Defendant was quiet and not talking.  She acknowledged having testified at the preliminary hearing that the Defendant smelled strongly of alcohol that night and having described him as "hysterical."  She further acknowledged having previously said that he was "not the same person" and was "mental" that night.

On redirect examination, the victim agreed that she had no idea how much the Defendant had to drink that night and that she was not an expert on alcohol tolerance.

The victim's daughter, Letisha Woodward, testified that she saw the Defendant earlier in the day on March 25, 2015, during a barbeque that her family held at the victim's home.  The Defendant appeared angry and sulking and did not say much before he and the victim left the home together.  Ms. Woodward explained that the Defendant had argued with one of her brother's guests during the family barbeque.  When the Defendant returned home that evening, he expressed his anger with the victim's preoccupation, "telling everybody in the living room . . . that [the victim] wasn't paying no attention to him."  She said it was approximately 5:30 to 6:00 p.m. when the Defendant complained about the victim's inattention.  She testified that she went to bed shortly afterwards and did not see the Defendant again that night.

Ms. Woodard testified that she was later awakened by the victim's coming into her room and walking toward her bed.  At the time, the lights in the bedroom were off but the television was on.  She asked the victim what she was doing but instead of speaking, the victim held up her hand to pantomime a gun.  When she turned on the light, she saw that the victim was covered in blood.  She responded by jumping out of bed, handing her baby to her grandmother, telling the victim to lie down and put pressure on her wounds, and calling 911.  On redirect examination, she added the information that the Defendant had been slurring his words when she last saw him but that she could clearly understand him.  She said she did not know if the Defendant was drunk and was never close enough to tell if he smelled of alcohol.

Sergeant Nathan Wilburn of the Memphis Police Department testified that he was dispatched at 1:00 a.m. on March 26, 2015, to the critical shooting call at the victim's residence.  Within minutes of his arrival at the scene, a call came in across the radio about the Defendant's being at a different location.

The parties admitted by stipulation the CD of the Defendant's March 26, 2015 1:13 a.m. 911 call, which was published to the jury. In the call, the Defendant said he had shot the victim and that he was going to "own up to [his] responsibility because she disrespected [him]." At other points during the call, the Defendant repeated that the victim had disrespected him, said that he was not "running from nothing," and mentioned that the victim was also "wrong for what she did."

Officer Jefferson reiterated much of his suppression hearing testimony, describing the radio dispatch about the Defendant's phone call to the police indicating that he wanted to turn himself in and his subsequent arrest of the Defendant at the service station. He said the Defendant was "very respectable [sic]" during the entire encounter and that he had no issues with him other than the Defendant's "spontaneous utterance" about feeling like a criminal when he was frisking him for weapons. Officer Jefferson testified that during that time, the Defendant told him that he had nothing on him and said that he "[t]hrew the gun after he shot that b****" and "I'm going to take responsibility for my actions." He did not recall the Defendant as being unsteady on his feet or slurring his speech and agreed that he would have documented those details had he noted them.

Officer Marcus Mosby of the Memphis Police Department's Crime Scene Investigation unit identified photographs of the crime scene. He testified that he found no shell casings at the scene but that some guns, such as revolvers, do not leave casings.

The State's final witness was Sergeant Hailey, who essentially repeated his suppression hearing testimony about the Defendant's desire to make a statement, his advising the Defendant of his rights, the format he followed in questioning, the Defendant's condition at the time he gave the statement, and the police department's policy of not taking statements from intoxicated individuals. He identified the Defendant's signed waiver and written statement, which were admitted as exhibits and published to the jury. In the March 26, 2015 statement, which was signed at 5:41 a.m., the Defendant said that he had recently moved into the victim's home, which was "when all the chaos started." When asked to describe the events that transpired, the Defendant related:

> We were lovey dubbie [sic] all week since she's been on vacation. But today she was acting funny toward me. She asked was I going to ride with her to get her nails done, I told her yea and when I said that she didn't go. I started cleaning the inside of my car and she started wiping out her car. I told her that I was going to kick it with my brother and when I got back she started tripping with me again. We got in a very heated argument. I told her that you brought me over here and this the way you going to do it, treat me. I went into the bedroom to lie down and she came in behind me.

The argument just got so heated and it just went down. I got so mad and I grabbed the gun and I just started shooting her. I just left the house ran and I got tired. I call the Police and I told them to come and get me cause I don't believe in running. I answered the Police questions and then they brought me down here.

When asked if he knew why he shot the victim, the Defendant replied: "I guess I was sending a message to her. She's going to know that you don't do people like that." Earlier in his statement, the Defendant estimated that he had fired approximately three shots at the victim and said that he "wasn't trying to kill her or nothing."

On cross-examination, Sergeant Hailey acknowledged that the Defendant told him that he had been drinking. He further acknowledged that the Defendant did not volunteer, and he did not ask, how much the Defendant had to drink. He repeated his direct examination testimony that he asked the Defendant if he was clear-headed and able to understand the seriousness of the situation, and reiterated on redirect examination that the Defendant gave no indications of being intoxicated or too impaired to give a statement.

## Defendant's Proof

The Defendant testified that he and the victim were in a romantic relationship for five months in which the victim alternated nights between her own home and the Defendant's apartment. That schedule ended, however, after the victim's son told them that his best friend had been killed at the Defendant's apartment complex and that he did not believe it was a safe place for the victim to live. In addition, the Defendant was later mugged at the complex. The Defendant, therefore, placed his belongings in storage, gave up his apartment, and moved into the home that the victim shared with her son, her daughter, her mother, and her brother, even though he was reluctant to do so because he feared a loss of privacy.

The Defendant testified that the victim changed after he moved in with her, becoming "bossy" and not paying him any attention. On the morning before the shooting, the two of them were cleaning their respective vehicles when she asked him if he wanted to accompany her to the nail salon. He told her that he would, but two minutes later she changed her mind, telling him that she was going to reschedule her appointment, which caused him to become suspicious. Later that evening, he left and went to his brother's home, where he drank two pints of 80-proof vodka and four 24-ounce cans of beer. On his drive back to the victim's home, he sideswiped a car and hit a curb, which caused a tire blowout. The Defendant identified a photograph of his vehicle that showed the tire blown out.

The Defendant testified that he left his vehicle in a Walgreen's parking lot and called his nephew to come pick him up. When he and his nephew arrived at the victim's home, he knocked on the door because he did not have a key, and the victim had not answered his phone calls. The victim answered the door, told him that he smelled "like a liquor store," and began yelling at him. His nephew left in order to avoid their argument, and he went to the bedroom he shared with the victim. The victim followed him and continued the argument, telling him that he was drunk, that he could not stay there, and that the Defendant needed to call his nephew to come back and get him. The victim then began telephoning his nephew herself. The Defendant testified that he went to the closet, retrieved the gun he had bought after he was mugged, turned, and shot the victim. He denied that he threatened to kill her or said anything to her before shooting her. Afterwards, he ran from the house, throwing the gun down in his flight, and went to the service station where he called the police and waited to turn himself in.

The Defendant testified that the officers took him to 201 Poplar, where he gave Sergeant Hailey a statement. He said he told Sergeant Hailey that he had been drinking but did not tell him how much alcohol he had had and that the detective did not ask him. After his statement, he was taken to the jail portion of 201 Poplar and from there, placed in the "detox" area of the jail.

The Defendant testified that he suffered from cardiomyopathy and high blood pressure and was on medication for those conditions at the time of the shooting. He said that his prescription medication, when combined with alcohol, made him feel even "more intoxicated." Since the shooting, he had met with two doctors about his mental health: Dr. Katie Price, who met with him once for approximately 45 minutes; and Dr. John McCoy, who met him three different times, with each meeting lasting longer than his single meeting with Dr. Price. Among other things, Dr. McCoy questioned him about his drinking history and habits. The Defendant testified that he began drinking as a teenager and that he drank varying amounts every day. He described himself as "very drunk" at the time of the shooting and said that he never had any intention to kill the victim. In fact, he said that he "wasn't thinking at all" when he shot her.

On cross-examination, the Defendant acknowledged that he went to the closet to retrieve his gun to shoot the victim, fled from the victim's home after the shooting, rid himself of the weapon, called 911, and related to the 911 operator what had happened, including that he had shot the victim because she had disrespected him. The Defendant further acknowledged having assured Sergeant Hailey that he understood his rights and wished to make a statement and having provided a detailed account of the shooting in his written statement. He also conceded that he shot the victim five times and had to pull the trigger for each shot. He insisted, however, that he was not aiming but instead "recklessly shooting." He testified that the victim was lying when she said that he told

her before the shooting that he was going to kill her and that Officer Jefferson lied when he testified that he told him that he had "shot the b****." Finally, he acknowledged that, despite having the opportunity, he never told Sergeant Hailey that he shot the victim because he was so drunk.

On redirect examination, the Defendant testified that if he had intended to kill the victim, he could have "just grabbed [her] and just boom, boom, boom, you know?"

Defense witness Dr. John McCoy, an expert in the field of clinical and forensic psychology, testified that he reviewed the Defendant's records and met with him for a total of over five hours in three separate interviews. Based on his evaluation, he diagnosed the Defendant with severe "alcohol use disorder," formerly known as alcoholism, and as suffering from "acute alcohol intoxication" at the time of the crime, meaning that he was "highly intoxicated" when he shot the victim. He stated that the Defendant informed him that he had drunk a fifth of vodka and four or five beers on the night of March 25, 2015, which, in his professional opinion, meant that the Defendant was a severe alcoholic, as that level of alcohol consumption was consistent with individuals who suffered from severe alcohol use disorder. Moreover, in his thirty years of work with patients with substance abuse problems, he had never encountered anyone who could drink that amount of alcohol and not be intoxicated. Finally, he opined that that the Defendant would not have been capable of premeditating the shooting due to his level of intoxication that night.

On cross-examination, Dr. McCoy acknowledged that the Defendant was the only individual he interviewed before making his diagnoses and that he relied on the Defendant's accurately reporting his alcohol use and habits. He said he had developed "pretty elaborate methods to detect" malingering during the fifty years he had been in private practice and was reasonably convinced that he could determine when a patient was malingering. He explained the concept of "tolerance" as the situation that exists when an individual in the early stages of their "use disorder" has to consume more and more of their drug of choice in order to achieve the same level of intoxication. When asked if someone who drank a fifth of vodka every day for a month or a year would be affected differently than someone who drank the same amount for the first time ever, he explained that tolerance levels are no longer as relevant in cases in which an individual has moved beyond the early or middle stages of their disease:

> This is a different matter. This is not the same as what you are talking about. This -- if you drink a fifth of vodka every day, your whole body has changed due to the deterioration caused by alcohol. The brain is changed, the heart's changed, the whole body -- that's a lot of alcohol. So, the person is deteriorating all along. As to how high he gets, you know, in

the early stages tolerance was relevant, but now it's not so relevant anymore.

On redirect examination, Dr. McCoy testified that the Defendant gave him no reason to believe that he was not being truthful with him. He stated that the Defendant told him that he varied in what he drank each day, sometimes drinking a fifth of vodka and sometimes drinking beer. However, on the night of March 25, the Defendant drank both vodka and beer, which, according to the Defendant, was more than he usually drank. The Defendant was unable to say why he drank more than usual that night. Dr. McCoy reiterated that an individual's "tolerance" to alcohol is a more useful concept during an individual's "mild to moderate substance use disorder" and repeated his opinion that the Defendant had been intoxicated at the time of the shooting.

## State's Rebuttal Proof

Dr. Katie Price-Verdell, an expert in the field of forensic psychology, testified that she was a contract licensed psychologist for West Tennessee Forensic Services and evaluated the Defendant in March 2017 to determine if he had the capacity to form criminal intent as it related to his intoxication. As part of her evaluation, she, among other things, reviewed the records and met with the Defendant in person in an interview that lasted between thirty minutes to one hour. She said the Defendant told her that he had drunk two pints of vodka and five or six beers on the night of March 25, 2015. The Defendant also told her of his history of prior alcohol use. She additionally looked at other factors, including the Defendant's behavior immediately before and after the shooting, as indicators of the Defendant's state of mind at the time of the offense.

Dr. Price-Verdell disagreed with Dr. McCoy's opinion that an individual's tolerance to alcohol is not a relevant concept to consider in the context of a long-term addiction:

One thing that did confuse me from his testimony was he made a statement that tolerance is not something that's important to consider in the context of addiction when someone has been addicted for a very long time[,] and I don't necessarily agree with that or understand where he was coming from with that. Tolerance is the idea that somebody who uses alcohol regularly gets into a pattern where they have to use more alcohol to get the same desired effect. So, somebody that, maybe, could become intoxicated off of three o[r] four beers when they began drinking, months or years later may have to consume a lot more and that's essentially what tolerance is. So, I don't think the amount of time that someone has an addiction has a change in tolerance.

- 11 -

Dr. Price-Verdell testified that neither "premeditation" nor "criminal intent" were diagnostic terms but that "the mental conditions that we're asked to evaluate related to mental health and related to diagnosis would be criminal intent rather than premeditation when we're dealing with issues of specifically diminished capacity when we're doing those kinds of evaluations." In her professional opinion, the Defendant, despite his alcohol intoxication on the night of the shooting and his history of alcohol addiction, "was able to act with intent in regard to the offense."

On cross-examination, Dr. Price-Verdell acknowledged having informed defense counsel that she had originally been "on the fence" as to whether or not the Defendant was suffering from intoxication at the time of the shooting. She said the Defendant told her that he regularly drank the same amount each day that he drank on the day of the shooting, which was two pints of vodka and five or six beers. She acknowledged that the Defendant might not have understood her question but said that she asked the two questions about how much he drank in a typical day and how much he drank on the day of the shooting at two different portions of her interview. She said she was not testifying that the Defendant would not have been intoxicated at the time of the shooting but that his level of intoxication would have been less than that of a non-drinker without the same addiction history. When asked whether she did not believe that an individual's "tolerance level begins to go in the opposite direction" as his or her body begins to deteriorate as a result of severe alcoholism, she replied:

> Those are two very different things I think he was trying to say. So, yes, the effects of long term alcohol use will have an effect on somebody's body as far as having effect on the liver, having effect on the brain cells, and just the toll that it takes on a person physically. The second part to what you're asking me, about tolerance changing in response to that, is not something I've ever come across in my research or in my clinical history.

Dr. Price-Verdell acknowledged that the "bulk of [her] practice" was not with addicts, that she had a PsyD rather than a PhD, and that she had signed her opinion letter as a "licensed psychologist" rather than a "licensed clinical psychologist." She explained that the State of Tennessee does not differentiate for licensing purposes between a licensed clinical psychologist and a licensed psychologist, instead licensing individuals in the field as a "licensed psychologist health service provider."

After their first phase of deliberations, the jury found the Defendant guilty of attempted second degree murder and employing a firearm during the commission of a dangerous felony. Following proof of the Defendant's prior conviction for reckless endangerment with a deadly weapon, the jury again deliberated and found the Defendant

guilty of unlawful possession of a firearm by a convicted felon. The trial court subsequently sentenced the Defendant to an effective term of twenty-eight years in the Department of Correction. This appeal followed.

## ANALYSIS

### I. Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his statements to the police. The Defendant argues that his confessions were neither knowing nor voluntary due to his extreme intoxication at the time he made the statements. In support, he points to his own testimony about his level of intoxication, Dr. McCoy's testimony that he was too intoxicated to premeditate the shooting, and the fact that the jail transferred him to the detoxification area of the jail following his interview with the detectives.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional rights to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

When determining the voluntariness of a statement, courts look at the totality of the circumstances surrounding the statement, including:

"[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting People v. Cipriano, 429 N.W.2d 781, 790 (Mich. 1988)).

"Intoxication is not alone sufficient to bar the introduction of statements made by an accused if evidence also shows that the accused was capable of understanding his rights." State v. Franklin Fitch, No. W2004-02833-CCA-R3-CD, 2006 WL 3147057, at *13 (Tenn. Crim. App. Nov. 2, 2006), perm. app. denied (Tenn. Feb. 26, 2007) (citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)).

In denying the Defendant's motion to suppress his statements, the trial court, among other things, accredited the testimony of Officer Jefferson that he did not ask any questions of the Defendant and the testimony of Sergeant Hailey that the Defendant was cordial and direct during questioning, assured him that he understood his rights and the seriousness of the situation, and did not appear to be intoxicated. The trial court, therefore, concluded that the Defendant's statement was freely and voluntarily made after having been properly informed of his rights and voluntarily agreeing to waive those rights and provide a statement. The record supports these determinations. Accordingly, we conclude that the trial court properly denied the Defendant's motion to suppress his statements to police.

## II. Limitation of Expert Witness's Testimony

The Defendant next contends that the trial court erred by unfairly restricting the testimony of his expert witness. Specifically, he argues that the trial court should have allowed Dr. McCoy to testify about the Defendant's bipolar disorder, history of child abuse, low IQ, and special education classes because such information was relevant to the Defendant's ability to form the requisite intent for both the indicted crimes and the lesser-included offenses. The State responds that the trial court properly limited Dr. McCoy's testimony to the Defendant's intoxication because Dr. McCoy's proffered testimony

about the other matters neither established a mental defect or condition nor showed how the Defendant lacked the ability to form a specific intent. We agree with the State.

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citations omitted). Diminished capacity

> is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed.

State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997) (citations omitted). Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming the requisite criminal intent due to an impaired mental condition. State v. Adams, 405 S.W.3d 641, 660-61 (Tenn. 2013) (citations omitted). To justify an instruction on diminished capacity, the proof must establish that any "inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." Id. at 661 (citing Hall, 958 S.W.2d at 690).

Testimony by an expert witness must also "satisfy the relevancy and expert testimony provisions in the Tennessee Rules of Evidence[.]" Ferrell, 277 S.W.3d at 379 (Tenn. 2009). "When, therefore, a defendant seeks to utilize expert testimony to negate an element of the offense, trial courts must consider the evidentiary principles pertaining to relevancy and expert testimony as set forth in the Tennessee Rules of Evidence." Id. at 380 (citing Hall, 958 S.W.2d at 689).

In a jury-out proffer, Dr. McCoy testified that he diagnosed the Defendant with bipolar disorder type two and alcohol use disorder. He further testified that the Defendant reported a history of severe childhood abuse and extreme poverty, which, according to Dr. McCoy, served to aggravate his bipolar and alcohol use disorders. Moreover, although the Defendant had managed to obtain an online associate's degree, he dropped out of school in the sixth or seventh grade, attended special education classes while in school, and had an IQ of 83, which was on the "low normal" range of the scale. Dr. McCoy testified that all of the above conditions would have combined to "play a role in [the Defendant's] ability to think clearly and to control his mood." He opined that, based on the above factors, the Defendant was unable to premeditate the shooting of the victim:

Well, they -- all of them play a role in his ability to think clearly and to control his mood. People that have bipolar disorder sometimes on occasion they're -- if you had a volume control where you could turn it and you could increase the person's experience of being angry just by doing that through electrical chemical changes in the brain, nothing has happened to the person, you just turn that and the more you turn it the more angry they get, some of these people get to where they're just furious and they can't figure out what they're mad about. They're just mad as hell and so on the night that this occurred, you know, he's got the background plus he's impaired with a high degree of alcohol intoxication, plus his IQ is not that good to begin with and he's under stress about the circumstances that have happened. And all of that impaired his ability to have premeditation when he allegedly committed the crime.

On cross-examination, Dr. McCoy further explained that although the Defendant made the decision to shoot the victim, he was incapable of controlling his behavior:

Well, he made the decision to do it, that's one thing. But to [be] able to have an opportunity to say no, that's crazy, I'm not going to do that, that's wrong, that's crazy, it's hurting another person, he didn't have that opportunity. He was -- his mood was so high, his mood was so angry, and he was so intoxicated, and he can't control his mood anyway because of the bipolar disorder, that he did not have the opportunity to do that.

At the conclusion of the jury-out hearing, the trial court ruled that Dr. McCoy could testify about the Defendant's alcohol use disorder and level of intoxication with respect to how they affected his ability to form intent. However, his proffered testimony about the Defendant's inability to premeditate due to his childhood abuse, newly diagnosed bipolar disorder, and his low IQ, was inappropriate and unwarranted in the case, as it was not "the type of mental disease or defect that was contemplated by the courts as allowing testimony for diminished capacity[.]"

We find no abuse of discretion in the trial court's ruling. In its ruling, the trial court noted that the Defendant's diagnosis of bipolar disorder was a new diagnosis made by Dr. McCoy after interviewing the Defendant for the defense. We note that Dr. McCoy's proffered testimony was not that the Defendant could not form the intent for attempted second degree murder, but instead that the Defendant's combination of bipolar disorder, alcoholism, alcohol intoxication, low IQ and abusive and difficult childhood made him unable to exercise better judgment before he acted on his decision to shoot the victim. The Defendant has not supplied any case law to support his assertion that a

- 16 -

combination of bipolar disorder, a history of childhood poverty and abuse, or a "low normal" IQ are "mental diseases or defects" that prevent a defendant from forming the requisite intent for the crime. The trial court, in its ruling, also observed that allowing such testimony would "open up the flood gates for diminished capacity in almost every case" as so many criminal defendants share a similar history of abuse, poverty, and various mental health issues. We, therefore, conclude that the trial court appropriately limited Dr. McCoy's testimony to the Defendant's intoxication and how that affected his ability to form intent.

### III. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence in support of his convictions for attempted second degree murder and unlawful possession of a firearm by a convicted felon. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

- 17 -

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## A. Attempted Second Degree Murder

"In order to convict a defendant of attempted seconddegree murder, the state is required to prove that the [Defendant] acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part." State v. Inlow, 52 S.W.3d 101, 104 (Tenn. Crim. App. 2000) (citing Tenn. Code Ann. §§ 39-12-101(a)(2) and 39-13-210(a)). "Whether the [defendant] 'knowingly' attempted to kill his victim is a question of fact for the jury. Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 104-5 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The Defendant contends that the evidence is insufficient to sustain his conviction for attempted second degree murder because his high level of intoxication at the time of the offense prevented him from acting knowingly, in that he was unaware of the nature of his conduct or that "his conduct was likely to cause the result that it caused."

However, when viewed in the light most favorable to the State, the evidence was sufficient for the jury to find the Defendant guilty of the attempted second degree murder of the victim. The Defendant, by his own admission, was in the middle of a heated argument with the victim when he went to the closet, retrieved his gun, turned, and fired multiple shots directly at her. Although it was undisputed that the Defendant had been drinking prior to the shooting, his level of intoxication was disputed by numerous witnesses, including: the arresting officer, who could not recall the Defendant's slurring his speech or stumbling; the interviewing officer, who did not notice any signs of intoxication; and the State's forensic psychologist, who opined that the Defendant, due to his history of heavy alcohol use, would not have been as impaired as the average individual who had consumed a similar amount and thus would have been able to form the intent for the crime. The jury also heard the 911 call, in which the Defendant, speaking clearly, provided an account of what had occurred, his motivation for the crime, and his desire to take responsibility for his actions. Based on all this evidence, a rational jury could reasonably find that the Defendant acted knowingly when shooting the victim. We, therefore, affirm the conviction for attempted second degree murder.

## B. Unlawful Possession of a Firearm by a Convicted Felon

The Defendant contends that the evidence is insufficient to sustain his conviction for unlawful possession of a firearm by a convicted felon because there was insufficient proof that he was previously convicted of a felony crime of violence or an attempt to commit a felony crime of violence, as charged in Count 3 of the indictment. We agree with the Defendant.

The Defendant was convicted of a violation of Tennessee Code Annotated section 39-17-1307, "Unlawful Carrying or possession of a weapon," which provides in pertinent part that "[a] person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" Tenn. Code Ann. §39-17-1307 (b)(1)(A). Tennessee Code Annotated section 38-17-1301 (3) defines "Crime of violence" as

> includ[ing] any degree of murder, voluntary manslaughter, aggravated rape, rape, rape of a child, especially aggravated rape of a child, aggravated sexual battery, especially aggravated robbery, aggravated robbery, burglary, especially aggravated burglary, aggravated assault, kidnapping, aggravated kidnapping, especially aggravated kidnapping, carjacking, trafficking for commercial sex act, especially aggravated sexual exploitation, felony child abuse, and aggravated child abuse[.]

Count three of the Defendant's indictment charged for this offense that the Defendant "did unlawfully and knowingly possess a firearm, having been convicted of Reckless Endangerment, a felony, involving the use or attempted use of violence, on July 17, 1997[.]"

The Defendant's conviction for reckless endangerment with a deadly weapon was a guilty plea conviction that resulted out of his indictment for aggravated assault. The trial court sustained the Defendant's hearsay objection to the admission of the indictment for aggravated assault, allowing only the judgment sheet for the reckless endangerment conviction to be admitted into evidence. Following the presentation of the State's proof, the Defendant made a motion for judgment of acquittal, arguing that because reckless endangerment with a deadly weapon is not inherently violent, the State failed to prove the prior violent felony element of the offense. The prosecutor disagreed, arguing that reckless endangerment with a deadly weapon is by its nature a violent offense. The prosecutor additionally pointed out that the judgment sheet for the conviction, which was before the jury, listed the indicted offense as aggravated assault and that the jurors could infer from that information that the Defendant's reckless endangerment conviction involved violence because they had been instructed on the elements of aggravated assault in the earlier portion of the trial. [357]

After examining the affidavit of complaint, which alleged that the Defendant had threatened a woman with a knife, the trial court found that the reckless endangerment with a deadly weapon conviction qualified as a felony involving the use or threatened use of violence.

We must respectfully disagree with the trial court's decision in this matter. Reckless endangerment with a deadly weapon is not specifically included in the list of enumerated offenses that meet the definition of a "crime of violence" in Tennessee Code Annotated section 38-17-1301(3). Moreover, the State failed to present any evidence from which the jury could have concluded that the Defendant's reckless endangerment with a deadly weapon conviction was a felony conviction for a crime of violence, an essential element for the Defendant to be convicted of a violation of Tennessee Code Annotated section 39-17-1307 as charged in his indictment. Accordingly, we reverse the Defendant's conviction for unlawful possession of a firearm by a convicted felon.

## IV. Failure to Instruct the Jury on Diminished Capacity

The Defendant next contends that the trial court erred by not granting his oral request that the jury be instructed on diminished capacity. The State asserts that there is nothing in the record to indicate that the Defendant requested the instruction, either orally or in writing, and therefore argues that the issue is waived. In the alternative, the State argues that, regardless of waiver, there was no evidence at trial to support an instruction on diminished capacity.

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011); see also State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 425 S.W.3d 268, 295 (Tenn. 2014).

As an initial matter, we agree with the State that there is nothing to indicate that the Defendant ever requested that the trial court instruct the jury on diminished capacity, as the portion of the record cited by the Defendant contains merely the parties' discussion of the scope of Dr. McCoy's testimony. Thus, we agree with the State that the issue is waived. See Tenn. R. App. P. 36(a) (stating that relief is not required if the party seeking

it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error").

We further agree with the State that, even if not waived, the Defendant would not be entitled to relief on the basis of this issue. The evidence at trial did not warrant an instruction on diminished capacity, as there was never any proof presented to the jury that the Defendant suffered from a mental disease or defect that impacted his ability to form the requisite intent for the crime. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this claim.

## V.  Sentencing

Lastly, the Defendant contends that the trial court erred in sentencing by not giving sufficient weight to applicable mitigating factors. Specifically, he argues that the trial court should have considered and applied in mitigation the Defendant's history of child abuse, diagnosis of bipolar disorder, and his low IQ. The State argues that the trial court properly exercised its discretion in imposing the within-range sentences for the offenses. We, again, agree with the State.

Under the 2016 amendments to the Sentencing Act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

At the sentencing hearing, the Defendant testified that he grew up in poverty with his mother and an alcoholic stepfather, who regularly beat him and verbally abused him. In addition to the Defendant's presentence report, the State presented three witnesses, the victim and two of the victim's aunts, who all testified about the devastating impact the victim's injuries had on the victim's life. At the conclusion of their testimony, the Defendant apologized to the victim and her family for his actions.

The trial court found two enhancement factors applicable: the Defendant's previous history of criminal convictions or criminal behavior and the particularly great psychological injuries suffered by the victim as a result of the crime. See Tenn. Code Ann. § 40-35-114 (1), (6). The court considered but rejected the Defendant's proposed mitigating factors that the Defendant acted under strong provocation, that he was suffering from a mental or physical condition that significantly reduced his culpability for the offense, that he committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated his conduct, and his history of child abuse and chronic alcoholism and the fact that he had apologized to the victim. See Tenn. Code Ann. § 40-35-113(2), (3), (8), (11), (13). The court gave slight weight to the Defendant's proposed mitigating factor that he turned himself in to the authorities. Id. § 40-35-113 (10). The court found that the enhancing factors greatly outweighed the single mitigating factor and therefore sentenced the Defendant as a Range I offender to 12 years for the attempted second degree murder conviction, the maximum in the range, and to 10 years for the employment of a firearm during the commission of a dangerous felony conviction. Pursuant to statute, the sentence for employment of a firearm during the commission of a dangerous felony was ordered to be served at 100% and consecutively to the sentences for attempted second degree murder.

The record reflects that the trial court properly considered the enhancement and mitigating factors and the principles and purposes of sentencing before imposing sentences within the applicable ranges for the Defendant's convictions. Accordingly, we affirm the sentences imposed by the trial court.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments in Counts 1 and 2 but reverse the judgment in Count 3 and dismiss Count 3 with prejudice.

_____
ALAN E. GLENN, JUDGE